UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS EMERY,<br><br>             Plaintiff,<br><br>      v.<br><br>CAROLYN COLVIN,<br><br>             Defendant. | Case No. 14-cv-00758-MEJ<br><br>**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 11, 12 |

## INTRODUCTION

Plaintiff Dennis Emery ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Carolyn Colvin, the Acting Commissioner of Social Security, denying Plaintiff's claim for disability benefits. Pending before the Court are the parties' cross-motions for summary judgment. Dkt. Nos. 11, 12. Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having carefully reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby DENIES Plaintiff's motion and GRANTS the Commissioner's cross-motion for the reasons set forth below.

## BACKGROUND

Plaintiff is a 32-year-old male that suffers from a spinal injury, arthritis in both knees, and anxiety attacks. AR 141, 167. He has a high school education and previous work experience as a stocker. AR 167-68.

In October 2009, Brian F. Schmidt, M.D., performed a surgical hernia repair of Plaintiff's groin. AR 228-33, 239-52. In November 2009, Dr. Schmidt stated that Plaintiff was "fully

healed" from the surgery, but now suffered from back pain. AR 226. He provided him with narcotic pain medication because Plaintiff did not have a primary care physician. AR 226.

In December 2009, Plaintiff visited Daniel Parker, M.D., complaining of back pain. AR 255. He felt that the pain was due to having been in four motor vehicle accidents in the past 3-4 years and stated that it was hard for him to stand up for a long time without pain, but that he walked a lot. AR 255. Physical examination revealed normal curvature of the spine, no muscle spasm, no tenderness, negative straight leg raising test, normal lower extremities, normal sensation, normal gait, and normal symmetrical reflexes. AR 255. Dr. Parker prescribed Tramadol and Norco, a narcotic pain medication. AR 256. Dr. Parker referred him to attend physical therapy. AR 256. Dr. Parker noted that "[m]uch of the visit [was] spent negotiating treatment" because Plaintiff wanted a prescription for Norco and was pessimistic that physical therapy would help. AR 256. Dr. Parker told Plaintiff that he would only provide him with a prescription for one month's worth of Norco, for use during physical therapy, and he would discontinue the Norco at the next visit. AR 256. There are no physical therapy notes in the record.

On January 26, 2010, Plaintiff visited the emergency room complaining of low back pain that he "had for several years." AR 237. He was given a prescription for Norco but advised to use less Norco and instead use Tylenol and Advil for primary relief of his back pain. AR 238. Plaintiff visited the emergency room again on February 2, 2010. AR 235. He complained of low back pain for the past five months and stated that he had run out of Norco. AR 235. He stated that ibuprofen (Advil) gave him nausea. AR 235. The attending physician gave him Vicodin, a narcotic pain medication, and recommended core conditioning exercises to treat his back pain. AR 235-36.

On February 24, 2010, Plaintiff visited Dr. Parker and stated that he was not taking any medications. AR 253. He stated that he had been exercising more, including walking every day with his uncle, using less marijuana, working on his posture, and doing more stretches and strengthening. AR 253. Dr. Parker renewed Plaintiff's prescriptions for Tramadol and Norco, but

encouraged him not to use pain medications. AR 254.

On March 11, 2010, Plaintiff visited the emergency room, complaining of back pain, joint pain and arthritis, and was given Norco. AR 263. Plaintiff visited the emergency room again on March 29, requesting Norco for back pain. AR 259. He also complained of productive cough with fever and sore throat, and was diagnosed with an upper respiratory infection. AR 359. Except for his throat, Plaintiff's physical examination findings were normal. AR 260. He was given Tramadol and Norco. AR 260-61.

On April 30, 2010, Plaintiff visited the emergency room complaining of back pain, occasional tingling in his left leg, and occasional left knee pain. AR 257. He wanted the attending physician to fill out his disability form. AR 257. He stated that he did not have a primary care physician, but "has had" one in Santa Rosa that sent him for physical therapy. AR 257-58. The attending physician noted that Plaintiff had functional back pain due to poor posture and recommended back exercises. AR 258. Plaintiff received Norco. AR 259. An April 30, 2010 x-ray of Plaintiff's lumbar spine was "unremarkable," revealing no fracture, deformities or malalignment; no significant degenerative changes; and the sacroiliac joints were within normal limits. AR 264.

Plaintiff received treatment at the West Oakland Health Center[1] on May 21 and June 4, 2010, where it was noted that he had arthritis and slept poorly. AR 272, 274. He was advised to do stretching exercises. AR 274.

On August 19, 2010, Plaintiff completed a written Function Report. AR 184-92. He stated that he could not sleep through the night and could barely eat because he was "always in pain." AR 186-87. He was limited in everything except hearing, seeing and understanding. AR 190. He could only walk a block or two; had to stop and rest when he walked because his feet and back hurt; was unable to stand, walk, or sit for long periods; and had to take long breaks due to fatigue,

---

[1] Although it is not clear from the record, Defendant notes that West Oakland Health Center is the medical group of Kenneth Matsumura, M.D., who Plaintiff claims is his treating physician. Def.'s Mot. at 10.

3

including while shaving and caring for his hair. AR 185-90. The length of time he could pay attention was "short" and he needed reminders from his family members or self-written notes because he would forget to take medicine or groom himself due to stress. AR 187, 190.

On October 5, 2010, Patricia Spivey, Psy.D., performed a comprehensive psychological evaluation regarding Plaintiff's complaints of depression and back pain. AR 276-78. Plaintiff stated that he had injured his back in a car accident in 2006 and had not worked since then. AR 276. He reported that he had been arrested "two or three times" for marijuana possession, and that he used marijuana regularly but did not smoke cigarettes. AR 276. He denied any treatment for psychiatric issues, but claimed that he talked to himself and saw his deceased relatives. AR 276. He admitted that he could perform his activities of daily living, including dressing, bathing, preparing meals, and managing his own funds, but his older brother sometimes cooked for him because he did not like to stand for a long time. AR 276-77. He never had a drivers' license so he got around by walking or taking the bus. AR 276.

Dr. Spivey noted that Plaintiff gave low effort throughout psychological testing and was not reliable in his claims. AR 277-78. She explained that Plaintiff did not originally complain of mood issues or psychiatric problems, but then responded positively to her questions about psychiatric symptoms. AR 278. She also noted that his extremely low full-scale IQ score of 68 was not consistent with his educational history and presentation. AR 278. Plaintiff's mental status exam revealed that he was fully oriented; had normal speech, thought process and content; had no evidence of poor reality testing, responding to internal stimuli, or any outward signs of thought disturbance; demonstrated a normal range of affect; and had fair insight and judgment. AR 277. Dr. Spivey concluded that Plaintiff's self-report of psychiatric symptoms was not consistent with her observations during the interview. AR 277-78. Dr. Spivey opined that Plaintiff's level of impairment was "none" in all categories of work related functioning, except that his level of impairment was "mild" in the category of ability to maintain emotional stability. AR 278.

On October 6, 2010, Farah M. Rana, M.D., conducted an internal medical evaluation

4

1  regarding Plaintiff's complaints of headaches and back pain. AR 279-81. Plaintiff told Dr. Rana
2  that he smoked a half a pack of cigarettes a day, smoked marijuana, and his current medications
3  were Flexeril and Motrin. AR 280. Dr. Rana noted that Plaintiff was only partially cooperative
4  with the examination. AR 280. Physical examination revealed normal head, neck, lungs, and
5  heart, but Plaintiff complained of prominent low back tenderness and did not perform the full
6  range of back motion. AR 280. Dr. Rana also noted that Plaintiff was not cooperative with
7  straight leg raising test, complaining of severe lower back pain. AR 280. His extremities and
8  musculoskeletal systems were normal, with no muscle wasting, no edema, non-tender joints, full
9  range of motion in all extremities, and no localized inflammation or swelling. AR 280. His
10 station and gait were normal and the Romberg's test (to detect poor balance) was negative. AR
11 280. He was neurologically intact, with full motor strength throughout, symmetrical deep tendon
12 reflexes, and no sensory deficits. AR 280. He claimed that he could only do light chores. AR
13 279. Dr. Rana assessed postural limitations and exertion consistent with an ability to do "light
14 work." AR 281. She listed the following impression:

15    1.   Chronic lower back pain, most probably secondary to degenerative disc disease.
16    2.   Stress/tension type headaches.
      3.   Status post left inguinal hernia repair.
17

18 AR 281.

19    On October 19, 2010, Linda Pancho, M.D., reviewed the evidence of physical impairment,
20 to date, and opined that Plaintiff had the limitations opined by Dr. Rana. AR 282-87, 290.

21    On October 26, 2010, G. Norbeck, M.D., evaluated the evidence of mental impairment, to
22 date, and opined that Plaintiff did not have a severe mental impairment. AR 289, 291.

23    On March 7, 2011, Daniel Lucila, M.D., and Beverly J. Morgan, M.D., reviewed
24 Plaintiff's claim file, which included newly submitted evidence, and concurred with the opinions
25 of Dr. Pancho and Dr. Norbeck. AR 312-14.

26    A December 12, 2011 x-ray of Plaintiff's cervical and lumbar spines showed "Mild C5-C6
27 disc degeneration," "Mild L4-L5 and L5-S1 disc narrowing," and "possible minimal degenerative

changes." AR 328.

In January 2012, Kenneth Matsumura, M.D., wrote a note on a prescription slip that Plaintiff was "completely disabled permanently from multiple medical problems, including degenerative disc disease. He has been my patient for almost two years." AR 329; *see also* AR 54 (Plaintiff testifying that Dr. Matsumura is the person who signed his medical marijuana card; AR 55 (Plaintiff testifying that "at first" Dr. Matsumura did not remember treating Plaintiff for two years).

## SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On June 1, 2010, Plaintiff filed a claim for Disability Insurance Benefits, alleging disability beginning on October 1, 2008. AR 141-44. On October 29, 2010, the Social Security Administration ("SSA") denied Plaintiff's claim, finding that he did not qualify for disability benefits. AR 75. Plaintiff subsequently filed a request for reconsideration, which was denied on May 5, 2011. AR 76. On July 5, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 93-95. ALJ Robert Wenten conducted a hearing on February 24, 2012. AR 29. Plaintiff appeared in person and testified on his own behalf. AR 35-61, 66-73. The ALJ also heard testimony from Vocational Expert Gerald Belchick. AR 61-66. Marcus Emery, Plaintiff's brother, also appeared and testified on Plaintiff's behalf. AR 52-53, 56-57, 60-61, 68-70.

**A.     Plaintiff's Testimony**

At the February 2012 hearing, Plaintiff testified that he lived with his brother and had a five-year-old daughter whom he sometimes saw during weekends. AR 35-36, 58. He testified that he was a high school graduate and had last worked at Safeway in 2006, for six to seven months, as an overnight stocker, but had stopped working because he and a coworker were in a car accident. AR 36-37. He stated that, other than helping family members out, he had no paid work since Safeway. AR 37-38. He testified that he had "tried a couple of jobs," but he used medical marijuana and employers "wouldn't allow [him] to be under the influence of marijuana on the job," and he would likely fail the drug screening tests, AR 38.

Plaintiff testified that he "probably messed [his] back up" by "sitting wrong" and incorrectly lifting things. AR 39-40. He also noted it was likely hereditary, as his sister has scoliosis, and most of his jobs since he was young involved" shipping and receiving warehouse type work" and construction, as well as overnight stocking at clothing stores. AR 40. He wanted to prove to his bosses that he was "one of the greatest workers in there," so he pushed himself too hard and his doctor said he now has the body of a 50-year-old. AR 47-48. Plaintiff stated that he had been "great" prior to his 2009 hernia surgery. AR 60.

Plaintiff testified that he could take care of his personal needs when he was taking his medication, but could not wash more than a couple of dishes or stand over the stove making meals because "after a minute" his back and heels would start to hurt. AR 41. He claimed that he had neck trouble, but admitted that he could look up and down, just not for a long period of time. AR 46-47. He stated that he was "stressed and depressed" throughout the day and could not work due to depression, trouble focusing, and "personal issues." AR 43, 51-52. The ALJ asked Plaintiff if he thought he could do jobs that allowed him to sit and Plaintiff stated that he could not, due to his medication. AR 49. He also testified that his medication sometimes made him drowsy, dizzy, or nauseated, depending on whether he took them regularly and with food. AR 42-43.

Regarding his multiple car accidents, Plaintiff stated that he had been a "wild animal" in his 20's, and he was a passenger in the cars of several friends who "used to drive crazy." AR 45-46. He stated that after the accidents, he had been "fine" but claimed that he must have gotten "whiplash and all that stuff" that was now catching up to him. AR 46.

Plaintiff testified that he took Acetaminophen, Cyclobenzaprine, and Naproxen. AR 54. He also uses medical marijuana at times, such as when he has to wait for a refill. AR 53-54. He started using marijuana because he was "kind of getting addicted" to pain medication. AR 55. He prefers medical marijuana because he feels it is "healthier" for him. AR 56.

**B.    Marcus Emery's Testimony**

Marcus Emery, Plaintiff's brother, testified that Plaintiff was on medication "18 to 20 hours out of the day," which causes him to be drowsy and unable to focus. AR 53. He stated that

Plaintiff could not sit down at a job because he has to move, but when he stands up he also has to sit back down. AR 53. He also testified that he helps Plaintiff make his food before he goes to work. AR 56

**C.  Vocational Expert's Testimony**

The vocational expert testified that Plaintiff's previous work experience as a stocker and day worker are classified at the medium exertional level. AR 62. The expert informed the ALJ that, if a person had to sit and stand throughout the course of the day and was limited to light lifting and carrying, he could not perform his past relevant work. AR 63. The expert testified that certain positions were available with a sit/stand limitation, including self-service gas station cashier, self-service parking lot cashier, toll collectors, and ticket sellers. AR 64.

**D.  The ALJ's Findings**

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.[2] 20 C.F.R. § 404.1520(a). The sequential inquiry is terminated when "a question is answered affirmatively or negatively in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990). During the first four steps of this sequential inquiry, the claimant bears the burden of proof to demonstrate disability. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). At step five, the burden shifts to the Commissioner "to show that the claimant can do other kinds of work." *Id.* (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

The ALJ must first determine whether the claimant is performing "substantial gainful activity," which would mandate that the claimant be found not disabled regardless of medical condition, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(i), (b). Here, the ALJ determined that Plaintiff had not performed substantial gainful activity since June 1, 2010. AR 20.

---

[2] Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d) (1)(A).

8

He noted that Plaintiff testified he had not worked since 2006, but the record showed he last worked in 2008, and the inconsistency, while not necessarily the result of a conscious intention to mislead, suggested that the information provided by Plaintiff "may not be entirely reliable." AR 20.

At step two, the ALJ must determine, based on medical findings, whether the claimant has a "severe" impairment or combination of impairments as defined by the Social Security Act. 20 C.F.R. § 404.1520(a)(4)(ii). If no severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined that Plaintiff had the following severe impairments: "mild C5-C6 disc degeneration and mild disc narrowing with possible degenerative changes at L4-L5 and L5-S1 as well as status post hernia surgery." AR 20.

If the ALJ determines that the claimant has a severe impairment, the process proceeds to the third step, where the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpart. P, Appendix. 1. 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is conclusively presumed to be disabled, without considering age, education and work experience. 20 C.F.R. § 404.1520(d). Here, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets the listings. AR 20. Accordingly, the ALJ's analysis ended at the third step.[3]

E.  **ALJ's Decision and Plaintiff's Appeal**

On April 13, 2012, the ALJ issued an unfavorable decision finding that Plaintiff was not

---

[3] Under the regulations, the ALJ would next determine the claimant's Residual Function Capacity ("RFC"), which refers to what an individual can do in a work setting, despite mental or physical limitations caused by impairments or related symptoms. 20 C.F.R. §§ 404.1520(e) and 404.1545(a)(1). The fourth step of the evaluation process requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work. 20 C.F.R. § 404.1520(a)(iv)(4), (f). In the fifth step, the burden shifts to the Commissioner to prove that there are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g); 404.1560(c).

9

disabled. AR 18-24. This decision became final when the Appeals Council declined to review it on December 18, 2013. AR 1-5. Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). On August 21, 2014, Plaintiff filed the present Motion for Summary Judgment. Dkt. No. 11. On September 19, 2014, the Commissioner filed a Cross-Motion for Summary Judgment. Dkt. No. 12.

## LEGAL STANDARD

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g). The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards." *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted). "Substantial evidence means more than a scintilla but less than a preponderance" of evidence that "a reasonable person might accept as adequate to support a conclusion." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)). The court must consider the administrative record as a whole, weighing the evidence that both supports and detracts from the ALJ's conclusion. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). However, "where the evidence is susceptible to more than one rational interpretation," the court must uphold the ALJ's decision. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ. *Id.*

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision. *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990). A court may not reverse an ALJ's decision on account of an error that is harmless. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)). "'[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.'" *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

10

**DISCUSSION**

In his Motion, Plaintiff raises two issues regarding the ALJ's decision: (1) the ALJ improperly rejected the opinions of Dr. Matsumura and Dr. Rana; and (2) the ALJ failed to fully and fairly develop the record when he evaluated Dr. Matsumura's opinion without having the treating medical records upon which he based his opinion. The Court shall consider each argument in turn.

**A.  Whether the ALJ Properly Rejected Dr. Matsumura's and Dr. Rana's Opinions**

Plaintiff first argues that the ALJ improperly rejected the January 2012 opinion of treating physician Dr. Matsumura by noting only that records from June 2010 (a year and a half earlier) do not mention degenerative disc disease or indicate where he had arthritis. Pl.'s Mot. at 4. He further argues that the ALJ improperly rejected Dr. Rana's opinion, as she found physical limits that would be considered "severe" at the second step of the sequential evaluation. *Id.* Other than these statements, Plaintiff provides no argument in support of his position and cites no legal authority.

"Cases in [the Ninth Circuit] distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, an opinion of a treating physician should be favored over that of a non-treating physician. *Id.* at 830-31. However, a treating physician's opinion "is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). If a treating physician's opinion is uncontradicted, an ALJ must give "clear and convincing" reasons that are supported by substantial evidence to reject the opinion. *Lester*, 81 F.3d at 830-31. However, if the treating physician's opinion is contradicted, an ALJ needs to only give "specific and legitimate reasons [that are] supported by substantial evidence in the record" to reject the opinion. *Id.* Further, the opinions of a specialist about medical issues related to his or her area of specialization are given more weight than the opinions

11

of a nonspecialist. 20 C.F.R. § 404.1527(c)(5); 20 C.F.R § 416.927(c)(5). "The ALJ is responsible for determining credibility and resolving conflicts" or ambiguities in the medical evidence. *Magallanes*, 881 F.2d at 750.

In determining what weight to give a medical opinion, the ALJ should give a treating physician's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007); 20 C.F.R. § 404.1527(d)(2). As explained in Social Security Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. [§] 404.1527. . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

S.S.R. 96-2p at 4 (Cum. Ed. 1996), available at 61 FR 34490-01 (July 2, 1996). Accordingly, when an ALJ finds a treating physician's opinion is not entitled to controlling weight, the following factors should be used to determine what weight to give that opinion: length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and any factors that may have bearing. 20 C.F.R. § 404.1527(c)(2)-(6); *see also Orn*, 495 F.3d at 632.

1. Dr. Matsumura

In his January 2012 note, Dr. Matsumura wrote that Plaintiff was "completely disabled permanently from multiple medical problems, including degenerative disc disease. He has been my patient for almost two years." AR 329. The ALJ noted that this opinion was not supported by the medical evidence of record. AR 24. An ALJ must evaluate a physician's explanations for his opinion, and the weight given to an opinion depends on the strength of such explanations. 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more

weight we will give that opinion."). Here, since there are no treatment notes and little to no explanation provided for Dr. Matsumura's opinion, this fact alone seems sufficient reason for the ALJ not to afford his opinion controlling weight. *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (treating doctor's opinion properly rejected when treatment notes "provide no basis for the functional restrictions he opined should be imposed on [claimant]"); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) ("[A]n ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings.") (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *Orn*, 495 F.3d at 631 (a treating physician's opinion will be afforded great weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques").

The ALJ determined that Plaintiff "has not sufficiently demonstrated that any alleged impairment causes, or has caused more than a slight abnormality or a combination of slight abnormalities that have more than a minimal effect on his ability to work." AR 24. As such, the ALJ concluded that Plaintiff failed to prove he has a severe impairment or combination of impairments. AR 24. In making this determination, he considered the objective medical findings, including the April 2010 x-ray of Plaintiff's lumbar spine, which was "unremarkable" and showed "[n]o fractures, misalignment or significant degenerative changes." AR 22, 264. He also considered the December 2012 cervical and lumbar spine x-ray, which showed only mild findings and "possible minimal degenerative change." AR 22, 328. As to the 2012 x-ray, the ALJ agreed that the degenerative change could constitute an "impairment," but it was not severe enough to be a "severe impairment." AR 24.

Regarding opinion evidence, the ALJ considered Dr. Rana's October 6, 2010, internal medical evaluation regarding Plaintiff's complaints of headaches and back pain. AR 22, 279-81. Dr. Rana's physical examination revealed that Plaintiff's extremities and musculoskeletal systems were normal, with no muscle wasting, no edema, non-tender joints, full range of motion in all extremities, and no localized inflammation or swelling, and that he was neurologically intact, with full motor strength throughout, symmetrical deep tendon reflexes, and no sensory deficits. AR

13

280. She assessed postural limitations and exertion consistent with an ability to do "light work." AR 281. Dr. Pancho reviewed the evidence of physical impairment and opined that Plaintiff had the limitations opined by Dr. Rana. AR 282-87, 290. The ALJ also considered Dr. Lucila's March 7, 2011 Case Analysis, in which he reviewed Plaintiff's claim file and concurred with Dr. Pancho's opinion. AR 22, 312-14.

The Court finds that this constitutes substantial evidence that supports the ALJ's decision. *Ryan*, 528 F.3d at 1198 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotations and citation omitted). Further, even if the evidence is susceptible to more than one rational interpretation, the Court must uphold the ALJ's decision. *Magallanes*, 881 F.2d at 750. Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ. *Id*. Thus, because the ALJ properly considered Dr. Matsumura's medical opinion and found that it was not supported by the record as a whole, the Court must uphold the ALJ's decision.

    2.    <u>Dr. Rana</u>

In her October 2010 evaluation, Dr. Rana assessed postural limitations and exertion consistent with an ability to do "light work." AR 281. The ALJ observed that this opinion was "largely based on the claimant's complaints, refusing to try certain tests at all, and, not surprisingly, the emotional claims are entirely unfounded." AR 24. In contrast, the ALJ looked to the opinion of the other examining doctor, Dr. Spivey, who determined that "essentially nothing [Plaintiff did was] reliable, including the claimant's complaints." AR 24. Given the lack of treatment records and Plaintiff's lack of full cooperation during testing, the ALJ's finding is supported by substantial evidence. During the examination, Dr. Rana noted that Plaintiff was only "partially cooperative with the examination," and that although the examination revealed normal head, neck, lungs, and heart, Plaintiff complained of prominent low back tenderness and did not perform the full range of back motion. AR 280. Dr. Rana also noted that Plaintiff was not cooperative with straight leg raising test, complaining of severe lower back pain. AR 280.

14

However, she found his extremities and musculoskeletal systems were normal, with no muscle wasting, no edema, non-tender joints, full range of motion in all extremities, and no localized inflammation or swelling. AR 280. She also found his station and gait were normal and that he was neurologically intact, with full motor strength throughout, symmetrical deep tendon reflexes, and no sensory deficits. AR 280. Except for self-reported complaints of back tenderness and reduced range of motion, Dr. Rana's objective findings were overall normal.

Given these findings, it appears that Dr. Rana's opinion rested on the credibility of Plaintiff's claims, yet Plaintiff does not dispute the ALJ's finding that he was not credible.[4] AR 23-24 (noting Plaintiff's inconsistent statements and alleged pain and dysfunction in excess of a level consistent with the objective and clinical findings in the record as a whole). For example, the ALJ noted that Plaintiff blamed his back problems on the hernia surgery, yet the medical records indicated that his operation was fully healed by November 2009, and he had also alleged that he had back pain since he was 15 years old, had back pain from doing heavy work, and had back pain from being in numerous car accidents. AR 21, 24. The ALJ also noted Plaintiff's lack of candor about his work history, given that Plaintiff maintained that he had not worked since

---

[4] A two-step analysis is used when determining whether a claimant's testimony regarding their subjective pain or symptoms is credible. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). First, it must be determined "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). A claimant does not need to "show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)).
 Second, if the claimant has met the first step and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (quoting *Smolen*, 80 F.3d at 1281). "The ALJ must state specifically which testimony is not credible and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284. Where the ALJ "has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record," courts must not engage in second-guessing. *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989). However, a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997) (citing *Lester*, 81 F.3d at 834; *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986) ("'Excess pain' is, by definition, pain that is unsupported by objective medical findings.").

2006, but his earnings records indicated that he had worked through 2008. AR 20, 162. While the failure of the medical record to fully corroborate a claimant's subjective symptom testimony is not, by itself, a legally sufficient basis for rejecting such testimony, it is a factor that the ALJ may take into account when making a credibility determination. *Rollins*, 261 F.3d at 856. Thus, the Court finds that the ALJ did not err when he considered the lack of objective evidence and objective functional restrictions as a factor in assessing Plaintiff's credibility. And, as discussed above, the Court finds substantial evidence in the record that supports the ALJ's decision.

Based on this analysis, the Court finds that the ALJ properly rejected Dr. Matsumura's and Dr. Rana's opinions.

**B.     Whether the ALJ Failed to Develop the Record**

Plaintiff next argues that the ALJ failed in his duty to fully develop the record. Pl.'s Mot. at 4. Specifically, Plaintiff notes that although the ALJ issued his decision in April 2012, the record contains no treating medical chart notes dating later than June 2010 and no treating records other than the x-rays obtained in 2011, despite the fact that Dr. Matsumura indicated in January 2012 that Plaintiff had been his patient for the past two years. Thus, Plaintiff argues that the ALJ improperly adjudicated over a year of potential eligibility for benefits while having close to no evidentiary basis for that period. *Id.*

In response, Defendant argues that SSA's duty develop the record was fulfilled by making a reasonable attempt to obtain medical evidence from Plaintiff's treating sources and ordering consultative examinations. Def.'s Mot. at 10. Defendant notes that SSA sent Plaintiff for both physical and mental consultative examinations, and it made reasonable attempts to obtain the evidence from Plaintiff's treating sources, including obtaining the treatment notes from Dr. Matsumura's medical group. *Id.*

"The ALJ in a social security case has an independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Tonapetyan*, 242 F.3d at 1150 (quoting *Smolen*, 80 F.3d at 1288). "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to

16

'conduct an appropriate inquiry.'" *Id.* (quoting *Smolen*, 80 F.3d at 1288). Courts in the Ninth Circuit have held that an ALJ violates the duty to develop the record if (1) the record lacks critical information regarding the claimant's application of disability benefits, (2) the record does not include third-party function reports, i.e., reports by a lay witness with personal knowledge of the claimant's condition, (3) the record does not include a daily activities questionnaire by the claimant, (4) the ALJ does not inquire into the claimant's ability to lift, carry, sit, stand, walk; the claimant's daily activities; and her medication during the hearing, and (5) the claimant potentially suffers mental impairment. *See, e.g., Hadera v. Colvin*, 2013 WL 4510662, at *3-4 (N.D. Cal. Aug. 22, 2013); *Villegas v. Astrue*, 2010 WL 4537825, at *3-4 (C.D. Cal. Nov. 1, 2010); *Levy v. Astrue*, 2009 WL 2163512, at *5-6 (C.D. Cal. July 19, 2009).

In his January 2012 note, Dr. Matsumura wrote that Plaintiff was "completely disabled permanently from multiple medical problems, including degenerative disc disease. He has been my patient for almost two years." AR 329. Despite Plaintiff's claim that Dr. Matsumura is his treating physician, he provided no medical records from Dr. Matsumura to support this opinion. The ALJ found that it was "rather bizarre" and he could not find support in the record for Plaintiff's allegation that he was indeed a treating physician. AR 24. The ALJ explained, "I have no idea what to make of this note because 'multiple medical problems' does not define a severe impairment and 'degenerative disc disorder' is not supported by the X-Ray studies of record." AR 24. The ALJ also found that the records from Dr. Matsumura's medical group, dated May 2010 and June 2010 (AR 272, 274), indicated that Plaintiff had arthritis, slept poorly, and was advised to stretch. AR 23. However, they did not mention anything about "degenerative disc disease" nor did they clarify where, if anywhere, he had arthritis. AR 23.

Although the ALJ did not specifically find that the evidence of Plaintiff's impairment was ambiguous, or that he lacked sufficient evidence to render a decision, he did find that Dr. Matsumura's note was "rather bizarre." AR 24. However, there is no requirement that an ALJ must conduct an inquiry whenever presented with an unsubstantiated opinion. *Tonapetyan*, 242 F.3d at 1149-50 ("The ALJ gave sufficient reasons, supported by substantial evidence in the

17

present record, for rejecting the opinion of Dr. Gevorkian ... because it was unsupported by rationale or treatment notes, and offered no objective medical findings to support the existence of Tonapetyan's alleged conditions."). In this case, as discussed above, the evidence of record was not ambiguous, and the ALJ determined that the record, containing opinions from multiple medical doctors, was sufficiently developed to allow for proper evaluation. AR 24.

Further, SSA had already sought and obtained the treatment notes from Dr. Matsumura's medical group, and those notes failed to substantiate Dr. Matsumura's opinion regarding degenerative disc disease and a finding of complete disability. AR 272, 274. SSA also sent Plaintiff for physical and mental consultative examinations. AR 276-81. Thus, the ALJ had no duty to further develop the record. *Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001) (if the record before the ALJ is adequate to allow for proper evaluation of the evidence, the ALJ has no duty to develop the record further) (citing *Tonapetyan*, 242 F.3d at 1150). Plaintiff bears the burden of proving that he is disabled, and he cannot shift that burden by arguing that the ALJ should have developed the record further. 42 U.S.C. § 405(g); *Mayes*, 276 F.3d at 459.

Finally, as to Dr. Matsumura's opinion that Plaintiff was "completely disabled," the Ninth Circuit explained that "this determination is for the Social Security Administration to make, not a physician." *McLeod v. Astrue*, 640 F.3d 881, 884 (9th Cir. 2011). Based on this analysis, the Court finds that Plaintiff was not deprived of a full and fair hearing.

## CONCLUSION

For the reasons stated above, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: October 15, 2014

_____
MARIA-ELENA JAMES
United States Magistrate Judge